UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Melissa Currier, et al.

      v.                              Civil No. 1:19-cv-1196-JL
                                       Opinion No. 2022 DNH 024P

Newport Lodge No. 1236,
Loyal Order of Moose, et al.

**MEMORANDUM ORDER**

In this case involving New Hampshire's liquor liability statute (colloquially known as the "Dram Shop Act"), the court must decide whether a bartender who claims she observed no obvious signs of intoxication in a patron can still be liable for negligent or reckless service of alcohol to that patron. The basic facts are simple, but tragic. Kristin Lake drank alcohol at a Newport, New Hampshire "Moose" lodge.[1] She left the lodge in her own vehicle to drive home to Vermont. Roughly fifteen minutes after leaving the lodge, Lake collided with a vehicle occupied by two young adults. The two young adults died as a result of the crash. Two hours after the crash, during which Lake did not consume alcohol, her blood alcohol concentration registered at 0.12%.

The plaintiffs, as executors of their deceased children's estates, sued the Newport Lodge and Moose International, Inc., the corporation charged with managing a system of Moose lodges throughout the United States. The plaintiffs contend that the Newport Lodge – through the actions of its bartender on the night of the crash, Bonnie Burrows – negligently and recklessly served Lake alcohol while Lake was intoxicated. They further assert that Moose International is vicariously liable for the Newport Lodge's negligence under an agency theory, and that Moose

---

[1] The Moose fraternity describes itself as an "international organization of men and women dedicated to caring for young and old, bringing communities closer together, and celebrating life." See https://www.mooseintl.org/ (last accessed March 1, 2022).

International breached an assumed duty of care relating to the service of alcoholic beverages at the Newport Lodge's "social quarters" (which are, in essence, bars for Moose members and their guests).

This court has jurisdiction over the plaintiffs' claims under 28 U.S.C. § 1332 because parties are citizens of different states and the amount in controversy exceeds $75,000. The parties agree, and the court confirmed at oral argument, that New Hampshire law applies to the plaintiffs' claims.

The Newport Lodge moves for summary judgment, arguing that the liquor liability statute requires an intoxicated patron to show visible or obvious signs of intoxication in order for a bartender to be liable for negligent or reckless service. Here, the lodge contends, it is undisputed that neither Burrows nor anyone else with Lake on the night of the crash observed her displaying obvious signs of intoxication, so the lodge is entitled to judgment as a matter of law on these claims. Moose International also moves for summary judgment, arguing that neither the nature of its relationship with the Newport Lodge nor the limited level of control it exercised over the Newport Lodge are sufficient to find, as a matter of law, that Moose International assumed a duty or is vicariously liable for the Newport Lodge's actions. The plaintiffs cross-move for partial summary judgment against Moose International and ask the court to find an assumed duty and an agency relationship.

After careful consideration of the parties' submissions and hearing oral argument, the court grants Moose International's motion, grants the Newport Lodge's motion in part and denies it in part, and denies the plaintiffs' motion. The court interprets the liquor liability statute as requiring some evidence of intoxication that would put a reasonably prudent bartender on notice that he or she was serving an intoxicated person. This could include both the observable signs of

2

intoxication, as well as other objective indications, such as (inter alia) the number of drinks served, the alcohol content of the drinks, and the timeframe in which the patron consumed the drinks.

Here, a rational jury could find based on this record (consisting of mostly circumstantial evidence) that Burrows knew, or a reasonably prudent person in her position would have known, that she was serving an intoxicated person. Although this will likely be a challenging case for the plaintiffs, they have therefore created a trial worthy issue as to their negligent service claim. No rational jury, however, could find that Burrows' service was reckless, as the governing statute requires evidence of conduct that creates a substantially greater risk of harm than merely negligent conduct, and no such evidence exists here. Lastly, Moose International is entitled to judgment as a matter of law on the plaintiffs' negligence and vicarious liability claims because there is insufficient evidence that Moose International had the right to control, and actually exercised control over, the Newport Lodge's social quarters and service of alcohol. Thus, no agency relationship existed between Moose International and the Newport Lodge, and Moose International did not assume or voluntarily undertake a duty to oversee the service of alcohol at the Newport Lodge.

## I.    <u>Applicable legal standard</u>

**Summary judgment.** Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable law. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010). In

analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party."  Id.

Where, as here, the plaintiffs bear the ultimate burden of proof, once the movant has made the requisite showing, the plaintiffs can no longer "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute."  Torres-Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007).  That is, the plaintiffs "'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which [they] would bear the ultimate burden of proof at trial."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

**Motion to strike.**  Defendants also move, under Fed. R. Civ. P. 37(c)(1), to strike the document plaintiffs submitted as Exhibit 8 with their summary judgment papers.  "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  Thus, "the baseline rule is that the required sanction in the ordinary case is mandatory preclusion of late-disclosed information."  Harriman v. Hancock County, 627 F.3d 22, 29 (1st Cir. 2010) (quotation marks and bracketing omitted).  The court considers several factors in determining whether preclusion is appropriate, including "the sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket, and the sanctioned party's

need for the precluded evidence." Id. at 30 (citing Esposito v. Home Depot U.S.A., Inc., 590

F.3d 72, 76 (1st Cir. 2009)).

## II.    Background

The following facts are undisputed, unless otherwise noted.  See L.R. 56.1(b) ("All

properly supported material facts set forth in the moving party's factual statement may be

deemed admitted unless properly opposed by the adverse party.").  The court notes at the outset

that the parties' factual statements contain more advocacy or "spin" than the local rules

contemplate.  Moreover, the parties, and plaintiffs in particular, whose counsel this court holds in

high professional regard, either fail to cite to the record, or inaccurately characterizes certain

evidence in the record, when stating facts in their summary judgment papers.  All of this

unnecessarily complicates the court's task of determining which facts are truly undisputed.

### A.    The Newport, New Hampshire Moose Lodge

The Newport Lodge is one of several local Moose lodges in New Hampshire and a

chapter of the international fraternal organizations, the Loyal Order of Moose and Women of the

Moose.[2]  Moose International, Inc. is an Indiana corporation that acts as the headquarters and

corporate structure of the aggregate system of Moose lodges and chapters.[3]  Moose International

does not own the property on which the Newport Lodge is located.  The Newport Lodge is

individually incorporated and has its own Board of Officers.  The Board of Officers is elected by

lodge membership and comprised of a Governor, Junior Governor, Prelate, Administrator,

Treasurer, and Trustees.  The Newport Lodge's Administrator from 2016 to May 2021 was

---

[2] See General Laws (doc. no. 45-2) at § 2.6.

[3] See id. at § 2.1.

Lawrence Peck.  The Newport Lodge is also licensed to serve alcoholic beverages by the New Hampshire Liquor Commission and typically serves alcohol to Moose members and their guests in its social quarters.  The rules vest the lodge's "House Committee"[4] with the power to govern, regulate, and control the social quarters, and it is the House Committee's duty to "strictly enforce" the "Rules and Regulations for Social Quarters Operation."[5]

### B.        The night of the fatal collision

On September 22, 2017, lodge member Cody Osgood and his guest Kristin Lake arrived at the Newport Lodge's social quarters at approximately 9:30 to 9:45 p.m.[6]  There is conflicting evidence in the record about what the pair was doing beforehand, and whether and how much they were drinking alcohol.[7]  Cody and Lake were friends from college.  At that time, Lake was five feet, four and a half-inches tall and weighed between 130 to 140 pounds.[8]  Cody signed Lake into the lodge's guest book and they approached the bar.  The sole bartender at the lodge that evening was Burrows, a longstanding part-time employee of the lodge and a "Training for Intervention ProcedureS" trained[9] bartender.  Burrows confirmed that Cody signed Lake in and

---

[4] The House Committee consists of the lodge's elected Board of Officers and the Jr. Past Governor.

[5] See General Laws (doc. no. 45-2) at § 48.2; Rules and Regulations for Social Quarters Operation (doc. 45-7).

[6] The court approximates Lake's time of arrival at the lodge, as well as other relevant points in time, because the witnesses provided ranges of time and the court cannot otherwise glean precise times from the record.

[7] As explained infra, the evidence of prior alcohol consumption is something that the plaintiffs will contest at trial, but which arguably helps them at the summary judgment stage.

[8] Lake Depo. (doc. no. 60-1) at 26.

[9] This training, known as "TIPS" training, is a "skills-based training program [for servers and bar owners] designed to prevent intoxication, underage drinking, and drunk driving."  See

checked her identification, as Burrows had never met or seen Lake before.  Burrows did not

observe any signs of intoxication in Lake when Lake arrived at the lodge.

       Shortly thereafter, Cody's aunt and uncle, Tina and Jeff Osgood, arrived at the lodge.  At

approximately 10:00 p.m., Tina ordered her usual drink of "Tito's (vodka) with Crystal Light

and water," and Lake ordered the same.  Burrows prepared and served Lake's drink in a pint-

sized glass with ice.  To prepare the drink, Burrows used the "free pour" method to add the

alcohol, in which she counted to three in her head while pouring the alcohol rather than

measuring the alcohol with a shot glass or other device.  Burrows also served a light beer to

Cody and a rum-and-cola to Jeff.  After receiving their drinks, Lake, Cody, Jeff, and Tina went

to a porch area of the lodge and sat at tables.  Burrows watched the group take their seats on the

porch through a window.[10]

       The group sat on the porch for approximately 20 minutes, and Tina and Lake talked

during this time.  During their conversation, Tina did not observe any behaviors or signs

indicating that Lake was intoxicated.[11]  Around 10:20 to 10:30 p.m., Cody purchased a second

mixed drink for Lake – another Tito's vodka with water and Crystal Light.  Lake consumed

---

https://www.gettips.com/about/index.html (last accessed March 1, 2022).  After successfully
completing the training, participants receive a TIPS certification.

[10] It is unclear from the record how far Burrows was from the group or whether Burrows could
see them as they sat and drank their drinks.  One witness testified, however, that the sightlines
for the bartender seeing out to the porch area are "not good."  See Williams Depo. (doc. 60-2) at
87-88.

[11] Tina was a trained bartender at that time of the events at the center of this case.  She described
typical signs of intoxication as slurring words, abnormal gait, glassy eyes, and stumbling on their
feet.  See Burrows Depo. (doc. no. 59-1) at 31, 53-54.

approximately half of her second drink.  There is disputed evidence potentially creating the inference that she consumed a third drink at the lodge.[12]

The group left the lodge just before closing time at 11:00 p.m. and continued talking briefly in the parking lot.  Burrows saw Lake leave the lodge but did not speak with her as she was walking out.  Burrows did not observe Lake staggering, swearing, or yelling as she exited. Prior to leaving, Tina offered to let Lake stay overnight at Tina's house, instead of returning home to Vermont.  Lake declined the offer and left the lodge by herself, in her own vehicle.

Shortly after leaving the lodge, while driving on Route 10 in Croydon, New Hampshire, Lake fell asleep at the wheel and collided head-on with a vehicle traveling in the opposite lane. Michelle Fenimore, age 20, was driving the other vehicle with her then-co-worker Nicholas Carpenter, age 18, in the front passenger seat.  Fenimore and Carpenter died at the scene of the crash.  Emergency medical technicians and other first responders treated Lake at the scene and transported her by ambulance to Dartmouth-Hitchcock Medical Center.  None of these EMTs or first responders observed that Lake was displaying signs of intoxication, such as the odor of alcohol, slurred speech, difficulty communicating, or incoherence or unresponsiveness.

Upon arriving at Dartmouth-Hitchcock, registered nurse Emily Glaner treated Lake. Glaner observed that Lake's speech was normal and she exhibited no signs of intoxication. Shortly after 1:00 a.m. on September 23, approximately two hours after the accident, Lake's blood alcohol concentration registered at 0.12%, which was higher than the New Hampshire legal limit of 0.08%.[13]  There is no evidence, or suggestion from the plaintiffs, that Lake

---

[12] Lake told an EMT that responded to the crash scene that she had consumed three "cape cods" on the night of the crash, and at oral argument, plaintiffs' counsel referenced the fact that Lake may have had a third drink at the Lodge.

[13] The hospital collected a blood sample from Lake and tested blood serum, not whole blood, for alcohol concentration.  The alcohol concentration in the serum registered at 0.14%, and the

consumed alcohol between leaving the Newport Lodge and the time her blood was drawn for testing.

New Hampshire Liquor Commission Investigator Benjamin Williams investigated the circumstances leading up to the crash. As part of his investigation, Williams interviewed Burrows at the Newport Lodge and had her perform a demonstration of how she pours her mixed drinks using pint glasses. For the demonstration, Burrows took a pint glass, filled it with ice, and poured vodka into it. At that point, Williams took the glass back, held his hand over the top of the glass to prevent the ice from spilling out, and poured the liquid into three shot glasses. He then measured the liquid he had poured out, which registered at 3 ounces of liquid. Burrows admitted to Williams that her demonstration pour contained less alcohol than what she normally poured for customers.[14] After completing his investigation, Williams concluded that there was not enough evidence for the Liquor Commission to charge the Newport Lodge with improperly serving Lake under N.H. RSA § 179:5.

### C.   Moose International

Moose International has its own organizational structure and leadership team, and employs a network of Territory Managers throughout the United States and Canada. Territory Managers serve as liaisons between Moose International leadership and the leadership of the local lodges. Part of their role is to help local leadership understand the General Laws, including answering questions about the General Laws and providing recommendations with respect to

---

parties agree that this figure equates to a 0.12% whole blood concentration. The state's 0.08% presumptive legal limit refers to whole blood concentration.

[14] See Williams Depo. (doc. no. 60-2) at 113. Indeed, Burrows "admitted [to investigators] that Lake's drinks were likely stronger than the sample drink that she had poured." See Doc. no. 51-6.

lodge operations.  The General Laws describe some of the powers of the Territory Manager role

as follows:

> With proper identification, [Territory Managers] shall be empowered to attend
> any meeting of a lodge, or its committees.  They shall have power, with proper
> identification and written authorization, to demand and receive at any time from
> any fraternal unit, or any officer, all papers, books, records, files or evidence of
> indebtedness or other property for the purpose of fully inspecting and auditing the
> accounts and affairs of the fraternal unit.  Upon demand, each officer or member
> thereof shall immediately deliver to the authorized assistant representative all
> books, records, files and papers of the fraternal unit.
> . . .
>
> If any officer or member of a lodge or chapter shall fail to deliver upon demand
> any papers, books, records, files or other items to the authorized representative,
> they may be suspended from membership by the authorized representative, who
> shall communicate the reasons therefore immediately to the General Governor or
> Grand Chancellor.[15]

When they visit or interact with local lodges, Territory Managers complete field staff reports and

submit them to Moose International's Regional Manager for that territory.  Moose International

maintains electronic copies of these reports.[16]

Moose International also employs a Risk Manager, who procures insurance for the

corporation and its local lodges, submits claims to a third-party administrator, and oversees such

claims.  At the time of the crash, Ann Price was Moose International's Risk Manager.  Price also

provides lodges with recommendations and resource materials to promote safety within the

lodge.

The Territory Manager for the Newport Lodge at the time of the crash was Robert

Saindon.  Saindon was also a member of the Newport Lodge and patronized its social quarters.

At that time, there were 28 local lodges in Saindon's territory.  Following the crash, Saindon

---

[15] See General Laws, § 19.2(q).

[16] See id.

visited the Newport Lodge multiple times and met with Lodge Administrator Peck and Burrows
to discuss the state Liquor Commission's investigation.  During these meetings, Saindon checked
whether the Lodge's bartenders were current in their TIPS training, and recommended that the
Lodge stop using a free pour method to make mixed drinks and use a measured pour instead.
Saindon also reminded Peck to continue using the guest log book and check "Moose ID Cards"
for all members, every day.  Saindon suggested that Peck inform the full House Committee of
any information Peck had about the crash and resulting investigation.  At its next meeting, the
Board of Officers adopted Saindon's recommendation to stop using free pours and decided to use
one-and-a-half-ounce measured pours.[17]

### D.  Moose International's General Laws

As the governing body of the "Moose" fraternal order, Moose International promulgates[18]
a set of "General Laws," or rules or regulations, for its network of lodges and members.[19]  The
Newport Lodge, like all other chartered Moose lodges, agreed to follow the applicable rules and

---

[17] While inadmissible under Federal Rule of Evidence 407 to prove negligence, this fact is
potentially admissible to show control or the feasibility of precautionary measures.

[18] Defense counsel used the verb "promulgate" in its motion papers to describe Moose
International's enactment of the General Laws, but then walked that description back in later
filings and at oral argument.  Now, defense counsel contends that the "Supreme Lodge," not
Moose International, enacted the laws, rules, and regulations applicable to member lodges.  The
court finds this distinction insignificant for purposes of deciding this motion and, construing the
record in the plaintiffs' favor, it views the General Laws as enacted and instituted by both the
Supreme Lodge and Moose International, to the extent the two are considered separate entities or
governing bodies.

[19] See General Laws, § 5.4 ("The General Laws and Constitution are the power and authority
enabling Moose International to act on behalf of or at the direction of the lodges, the Supreme
Lodge, the chapters, and all other units and degrees of the Order."); § 11.1 ("The powers of the
Supreme Lodge as enumerated herein are exercised through Moose International as provided in
Chapter 5.").

regulations within the General Laws.  The General Laws provide the overall framework for how

to set up, operate, and dissolve lodges, as well as specific rules regarding aspects of running a

lodge, including (1) membership requirements and qualifications, dues and fees; (2) nomination,

appointment and election of lodge officers, and the powers and duties of such officers; (3) the

frequency, type, and subject matter of lodge meetings; (4) use of lodge funds; (5) community

service and charitable fundraising; and (6) advertising.[20]

The General Laws also permit lodges to establish social quarters within the "lodge

home."  If a lodge establishes social quarters, it must agree to be bound by the General Laws and

specific rules and regulations relating to the operation of the social quarters.  The General Laws

detail how the lodge's House Committee shall operate the social quarters, including provisions

on using guest registers or incident log books, posting rules and laws on a bulletin board,

employing help to run the social quarters, handling the finances derived from the social quarters,

maintaining and enforcing decorum in the social quarters, and rules for admitting members and

guests to the social quarters.[21]  Proceeds from sales made in a lodge's social quarters, including

liquor sales, go into the lodge's general fund for the lodge's operations and capital expenses.

Moose International also receives a portion of each lodge's social quarters' proceeds.

Relevant here, the General Laws provide that "[n]o person in a state of intoxication as

determined by a server shall be allowed to enter or remain in any social quarters or home

---

[20] See General Laws, at Chs. 26-46.

[21] See id., Chs. 47-50; see also Rules and Regulations for Private Social Quarters Operation (doc. no. 45-7).  At Moose International's 2014 annual convention for its membership, an employee gave a training presentation on "successful social quarters operation."  Doc. no. 50-10.  The presenter described the social quarters operation as a "business," and provided recommendations for how to make social quarters operations more profitable and safer, including following cocktail recipes and measuring alcohol pours.

maintained or operated by any lodge."[22]  The General Laws further require that anyone dispensing or serving alcohol at a lodge's social quarters "shall attend an approved alcohol server training program and be certified as having satisfactorily completed all requirements of said program."[23]  As such, the Newport Lodge has required TIPS certification for its bartenders or servers, including Burrows.

The General Laws give Moose International the power and ability to revoke or suspend the charter of a member lodge, or to suspend, discharge, or expel any member or officer of a lodge, for violating the General Laws and rules, regulations, and policies.[24]

## III.   <u>Analysis</u>

Defendants move for summary judgment on all four of the plaintiffs' claims.  The Newport Lodge argues that it is entitled to judgment as a matter of law on the plaintiffs' negligent service claim because the undisputed facts allegedly show that Lake was not "visibly intoxicated" (a description which does not appear in any applicable statute or judicial decision) at the time she arrived or drank alcohol at the Lodge's social quarters, an alleged requirement of the statute.  It further argues that it is entitled to judgment as a matter of law on plaintiffs' reckless service claim because the facts, even if construed in the plaintiffs' favor, do not rise to the level of recklessness required under the statute.  As for the claims against Moose International, it argues that there are insufficient facts in the record from which a rational jury could find that:

---

[22] General Laws, § 50.7; Rules and Regulations for Social Quarters, No. 11 (doc. no. 45-7) ("No person(s) in a state of intoxication shall be admitted or allowed to remain in the social quarters. The bartender is authorized to refuse service to anyone in a state of intoxication.").

[23] General Laws, § 50.7.

[24] <u>See</u> <u>id.</u> at §§ 23.2, 54.1, 55.3, 55.4.

(1) Moose International assumed a duty to oversee the sale of liquor at the Newport Lodge's social quarters; and (2) an agency relationship existed between Moose International and the Newport Lodge to impose vicarious liability on Moose International for the Lodge's alleged negligence.  The court first addresses the claims against the Newport Lodge.

### A.       Claims against Newport Lodge

### 1.       Count 1 – Negligent service

The plaintiffs' claims against the Newport Lodge derive from New Hampshire's liquor liability statute, RSA 507-F, et seq.  That statute provides "the exclusive remedy against a defendant for claims by those suffering damages based on the defendant's service of alcoholic beverages."  RSA 507-F:8.  The Newport Lodge does not dispute that the statute applies or provides a cause of action for the plaintiffs here.  It instead argues that the plaintiffs lack the proof necessary to show that its service of alcohol to Lake was either negligent or reckless.

Beginning with negligent service, the Newport Lodge contends that the plain language of the statute requires proof that the patron was "visibly" intoxicated or personally exhibited some obvious signs of intoxication.  Because no witness has testified that Lake showed such signs here, the Lodge argues that no rational jury could conclude that Burrows negligently served her.  The plaintiffs counter that the statute does not require visible signs of intoxication and that even if it did, there are genuine disputes of fact as to whether Burrows knew or should have known that Lake was intoxicated, which preclude summary judgment for the Lodge on this claim.  As explained below, the court agrees with the plaintiffs.

**Interpretation of the statute.**  The negligent service statute reads as follows:

I. A defendant who negligently serves alcoholic beverages to a minor or to an intoxicated person is liable for resulting damages, subject to the provisions of this chapter.

**II. Service of alcoholic beverages to a minor or to an intoxicated person is negligent if the defendant knows or if a reasonably prudent person in like circumstances would know that the person being served is a minor or is intoxicated.**

III. Proof of service of alcoholic beverages to a minor without request for proof of age as required by RSA 179:8 shall be admissible as evidence of negligence.

IV. Service of alcoholic beverages by a defendant to an adult person who subsequently serves a minor off the premises or who is legally permitted to serve a minor does not constitute service to the minor unless a reasonably prudent person in like circumstances would know that such subsequent service is reasonably likely to occur and is illegal.

V. A defendant does not have a duty to investigate whether a person being served alcoholic beverages intends to serve the alcoholic beverages to other persons off the premises.

VI. A defendant is not chargeable with knowledge of a person's consumption of alcoholic beverages or other drugs off the defendant's premises, when the person misrepresents such consumption or the amount of such consumption, unless the defendant's service to such person qualifies as reckless under RSA 507-F:5.

**VII. A defendant is not under a duty to recognize signs of a person's intoxication other than those normally associated with the consumption of alcoholic beverages except for intoxication resulting in whole or in part from other drugs consumed on defendant's premises with defendant's actual or constructive knowledge.**

RSA 507-F:4 (emphasis added).  An "intoxicated person" is "an individual who is in a state of intoxication as defined by this chapter."  RSA 507-F:1, III.  The statute defines "intoxication" as:

> an impairment of a person's mental or physical faculties as a result of drug or alcoholic beverage use so as to diminish that person's ability to think and act in a manner in which an ordinary prudent and cautious person, in full possession of his faculties and using reasonable care, would act under like circumstances.

RSA 507-F:1, IV.

Neither the New Hampshire Supreme Court nor any lower state or federal court has expressly held that this statute requires proof that the alleged intoxicated patron was personally showing visible signs of intoxication at the time of service.  At least one decision from this court, as well as secondary sources, including pattern jury instructions, seem to suggest that the statute

requires some form of "visible" intoxication.  See, e.g., Brennan v. Horsefeathers, Inc., No. CIV.

01-036-B, 2002 WL 1349509, at *1 (D.N.H. June 12, 2002) (Barbadoro, J.) (characterizing, in

dicta, RSA 507-F:4, as a statute "which prohibits serving alcohol to visibly intoxicated patrons");

1 New Hampshire Civil Jury Instruction 12.1 (2020) ("'Negligent service of alcoholic beverages'

means service to a minor or service to an intoxicated person.  Service of alcoholic beverages to

such persons is negligent if the server knows, or if a reasonably prudent person under similar

circumstances would know, that the person being served is a minor or is visibly intoxicated."

(emphasis added)); 8 McNamara, New Hampshire Practice Series: Personal Injury: Tort and Ins.

Practice § 7.04 (2021) ("With respect to service of intoxicated persons, the statute makes clear

that the defendant's obligation is only to avoid serving those who are visibly intoxicated. . . .

Further, a defendant does not have a duty to recognize signs of a person's intoxication, other than

those normally associated with the consumption of alcoholic beverages, except for intoxication

resulting in whole or in part from other drugs consumed on the defendant's premises with the

defendant's actual or constructive knowledge." (emphasis added)).

　　　　These sources, while useful, do not control the court's analysis.  As prescribed by the

New Hampshire Supreme Court, this court instead begins with the statutory language itself.

Hendrick v. New Hampshire Dep't of Health & Hum. Servs., 169 N.H. 252, 259 (2016) ("When

interpreting a statute, we begin with the language of the statute itself, and, if possible, construe

that language according to its plain and ordinary meaning.") (citations omitted).  The court

interprets the disputed section of the statute "in the context of the overall statutory scheme and

not in isolation."  Id.  The statute requires the plaintiff to show either: (1) that the server knew

the patron was intoxicated; or (2) that a "reasonably prudent person in like circumstances would

know" that the patron was intoxicated.  RSA 507-F:4, II.  This language is not "subject to more

than one reasonable interpretation" and thus unambiguously sets the standard for negligent

service.  Appeal of Naswa Motor Inn, 144 N.H. 89, 90 (1999); see also Thinking Mach. Corp. v.

Mellon Fin. Serv. Corp. (In re Thinking Mach. Corp.), 67 F.3d 1021, 1025 (1st Cir. 1995) ("A

statute is ambiguous if it is capable of more than one reasonable interpretation.").  In the absence

of ambiguity, the court focuses on the "plain and ordinary" meaning of the statutory language.

Hendrick, 169 N.H. at 259 ("When the language of the statute is clear on its face, its meaning is

not subject to modification.").

      Under this statute, a server may obtain knowledge of intoxication through more than just

obvious or visible signs exhibited by the patron.  Said differently, nothing about the statute's

language limits the evidence contributing to that knowledge to "visible" manifestations exhibited

by the patron.  Other factors may inform, or reasonably could inform, what a bartender knows or

would know about a patron's intoxication, such as the number and type of drinks consumed, the

amount of alcohol in the drinks, the time frame and pace of consumption, and information

communicated or otherwise available to the bartender about the patron.  None of these are

observable "signs" displayed by the patron, but all of them could lead the bartender to know that

the patron may be intoxicated.  Nor is this an exhaustive list.  The plain meaning of the statute

allows for other factors to contribute to the knowledge of a "reasonably prudent person in like

circumstances."  RSA 507-F:4, II.  Of course, observable signs, such as slurred words, bloodshot

eyes, unsteady gait, stumbling or inability to walk, or loud, boisterous behavior, still suffice.

      The Newport Lodge argues that subsection VII of RSA 507-F:4 limits the duty of a

bartender to recognizing only these observable signs of intoxication exhibited by the patron.

That subsection provides that a "defendant is not under a duty to recognize signs of a person's

intoxication other than those normally associated with the consumption of alcoholic beverages

except for intoxication resulting in whole or in part from other drugs consumed on defendant's premises with defendant's actual or constructive knowledge." RSA 507-F:4, VII.  This language merely limits what signs of intoxication, personally manifested by a patron, that a bartender must recognize.  Nothing in the text, however, either expressly or impliedly limits the types of information or evidence, perceived or possibly perceived by a server, that a trier of fact may consider to determine whether a server knew or reasonably would have known that a patron was intoxicated, or limits that evidence to only personally exhibited signs of intoxication.

The parties also argue that the language of a different statute, RSA 179:5, New Hampshire's liquor enforcement law, supports their respective interpretations of RSA 507-F:4.[25] The court need not look to a different statute, or any other extrinsic source, to interpret RSA 507-F:4 because RSA 507-F:4 is unambiguous.  Nevertheless, the court's construction of RSA 507-F:4, II is "consistent with" RSA 179:5, rendering the two statutes in pari materia and interpretable as such.  In the Matter of Liquidation of Home Ins. Co., 166 N.H. 84, 88-89 (2014) ("When interpreting two statutes which deal with a similar subject matter, we will construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute.").  Both statutes prohibit service of alcohol to an individual "who a reasonable and prudent person would know is intoxicated." RSA 179:5, I; RSA 507-F:4, II (similarly prohibiting service if "a reasonably prudent person in like circumstances would know that the person being served is . . . intoxicated").  And neither statute

_____

[25] Prior to its amendment, RSA 179:5, I was a strict liability statute.  See In re Baldoumas Enterprises, Inc., 149 N.H. 736, 739 (2003).  The legislature amended the statute in 2009 to reflect a negligence-like standard.  See RSA 179:5, I ("No licensee, salesperson, direct shipper, common carrier, delivery agent, nor any other person, shall sell or give away or cause or allow or procure to be sold, delivered, or given away any liquor or beverage to a person under the age of 21 or serve an individual who is visibly intoxicated or who a reasonable and prudent person would know is intoxicated.").

limits the universe of evidence that may be used to show that a reasonably prudent person would know that a customer is intoxicated.

The court posed a hypothetical scenario to defense counsel at oral argument. In the hypothetical, a group of patrons enters a bar having previously spent time drinking at a different bar. When they step up to the bar to order drinks, one person in the group takes the bartender aside and tells her that another member of the group was cut off from service at the prior bar for acting too rowdy and drinking too much. The bartender nevertheless served an alcoholic beverage to the previously cut-off patron. The Newport Lodge's counsel contended at oral argument that unless the cut-off patron was personally showing observable signs of intoxication at the second bar, the second bartender could not be liable for negligent service under his interpretation of the statute. While the court appreciates counsel's resolve and straightforward candor in carrying its argument to any logical conclusion, it cannot agree that the statutory language permits, much less requires, that result. The statute imposes liability for what a bartender knew or a reasonably prudent bartender would have known. If a bartender was put on notice of a patron's potential intoxication, this notice, along with other information such as number of drinks, strength of drinks, pace of drinking, etc., are within the universe of evidence a jury could consider to determine whether a serving individual or establishment either knew or reasonably should have known they should not continue to serve alcohol to that person, even if the person was not showing obvious signs of intoxication.

**The evidence here, beginning with "expert" extrapolation.** Turning to the evidence here, the plaintiffs first argue that their retained toxicologist's opinion that a person with a BAC of .16 at the time of the crash would have shown outward signs of intoxication at the time of last

service precludes summary judgment for the Lodge.[26]  This type of evidence is generally

insufficient on its own to show that Burrows knew or a reasonably prudent person in her position

would have known that Lake was intoxicated at the time Burrows served her a second or

possibly third drink.[27]  Burrows did not know, nor could she have known, what Lake's BAC was

at the time of the crash or any other time that evening.  Thus, a plaintiff cannot prove negligent

service *solely* based on a hidden quality such as BAC.  Otherwise, RSA 507-F:4 would be a strict

liability statute, which it clearly is not.  See Baldoumas, 149 N.H. 736 at 739 (noting that RSA

507-F:4 imposes a negligence standard and observing that "when the legislature intends to create

liability for negligence instead of strict liability, it knows how to do so").

Nor is the toxicologist's opinion that a person with a BAC of .16 would have shown

observable signs of intoxication "in the 10-20 minutes prior to leav[ing] the Moose Lodge" *alone*

sufficient to show that Burrows knew or would have known that Lake was intoxicated at the time

of last service.  As the Supreme Judicial Court of Massachusetts and other courts have observed,

"the problem of individual variability in response to alcohol" may prevent "a plaintiff from

---

[26] See Darcy Richardson Report (doc. no. 51-9) at ¶ 29.  The plaintiffs attempt to buttress this
opinion with a "supplemental" report from Richardson that includes a calculation of Lake's BAC
at the time of last service at the Lodge.  Defendants move to strike this supplemental report
because it was improperly and belatedly disclosed.  See Doc. no. 53.  The court declines to strike
Richardson's supplemental report from the summary judgment record; it is nonetheless unlikely
that it will allow the substance of the inexplicably late-disclosed report to be introduced at trial.
While the parties are welcome to litigate the report's admissibility at trial in the normal course,
the court notes that the deadline for expert challenges has long passed.

[27] This is the operative point in time because the statute creates liability for negligent "service" of
alcohol and the plaintiffs do not argue that Lake was intoxicated at the time Burrows served
her the first drink at the Newport Lodge.  See RSA 507-F:1, IX (defining "service of alcoholic
beverage" or "service" as "any sale, gift, or other furnishing of alcoholic beverages").  Contrary
to the plaintiffs' suggestion at oral argument, "service" does not include allowing an intoxicated
person to remain in a bar or allowing that person to leave the bar.  Liability is expressly tied to
service of alcohol, as opposed to post-service monitoring of patrons.

relying exclusively on expert opinion to make out a case of apparent intoxication." Douillard v. LMR, Inc., 433 Mass. 162, 166-67 (2001).[28]  See, e.g., Beaulieu v. The Aube Corp., 796 A.2d 683, 691–693 (Me. 2002); Hollermann v. River Roost, No. C7–99–414, 1999 WL 639278 (Minn. Ct. App. Aug. 24, 1999); Chiesa v. Delta M.P., Inc., 1997 WL 33343296, *3 n. 2 (Mich. Ct. App. Oct. 7, 1997); Johnson v. Harris, 419 Pa. Super. 541 (1992); Purchase v. Meyer, 108 Wash.2d 220 (1987).  The evidence in Douillard, however, included more than just "the expert's opinion about what signs of intoxication a normal, average, or typical drinker would exhibit at a blood alcohol level of .154 percent."  The record contained "specific information concerning this particular drinker's reaction to alcohol consumption," including "direct evidence of [the drinker's] own reactions to alcohol to confirm that they are in fact comparable to the average drinker."  Id. at 167-68.[29]  This evidence was probative of "this particular drinker's reaction to alcohol consumption" and sufficient to survive defendant's summary judgment challenge and allow a jury to decide whether the "particular drinker more probably than not appeared intoxicated."  Id. at 167-68.[30]

---

[28] The Douillard court similarly observed that evidence "of elevated blood alcohol levels, at some later point in time [like the time of an accident] does not, by itself, suffice to show that the patron's intoxication was evident at the time the last drink was served" because of "the uncertainties of the situation, including the possible delayed impact of the consumption of alcohol, and the unknown effect on a patron of the last drink served to him by a licensee."  Id. at 165 (citations omitted).  Evidence of subsequent intoxication at the scene of an accident, however, "could bolster evidence of a patron's obvious intoxication while at a tavern." Vickowski v. Polish Am. Citizens Club of Deerfield, Inc., 422 Mass. 606, 612 n.5 (1996).

[29] This direct evidence included testimony from the drinker's friend "who had seen him intoxicated on ten occasions [and] confirmed that [the drinker] would indeed exhibit [outward] signs," including becoming "[o]verly social, loud, sick, [and] giddy," hugging people, and engaging in "[l]oud behavior," "[v]omit[ing]," and "laugh[ing] inappropriately."  Id. at 167.  The evidence also showed that the bartender had served the patron at least nine drinks, two more than the patron's alleged limit.  Id.

[30] While not controlling, Massachusetts' negligent service case law illustrates the type of evidence that may suffice to prove negligent service under RSA 507-F:4 because Massachusetts

Similar evidence of Lake's reaction to alcohol is missing here.  While Lake testified that at the time of the crash she normally did not consume more than two mixed drinks, she did not testify about how she behaved or reacted if she exceeded this claimed two-drink threshold.[31] And Cody Osgood – the only person with Lake on the night of the crash who had previously consumed alcohol with her – did not testify about how Lake normally behaved or reacted while consuming alcohol (because nobody asked him).  Cody noted, however, that while Lake drank alcohol in college, he did not believe that she had a drinking problem.  The record is thus devoid of any direct evidence of Lake's reactions to excessive consumption of alcohol to confirm that they are in fact comparable to how "most people"[32] would have reacted.

The court is therefore hesitant to use expert opinion, uncorroborated by any other evidence, direct or circumstantial, as the sole basis to find a dispute of fact (whether someone is showing signs of intoxication) ordinarily gleaned by observation of witnesses familiar with the drinker or present with her on the night in question.  See DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (the nonmoving party "must demonstrate, through submissions of evidentiary quality, that a trialworthy issue persists.  Factual specificity is required; a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden") (quotations omitted); see also Romano v. Stanley, 90

---

uses a nearly identical standard as RSA 507-F:4, II.  See Douillard, 433 Mass. at 164 ("a tavern keeper does not owe a duty to refuse to serve liquor to an intoxicated person unless the tavern keeper knows or reasonably should have known that the patron is intoxicated").

[31] See doc. no. 60-1, at 111:13-20; 128.  Lake also described herself as becoming more friendly, welcoming, and opening up as she finished her first drink at the Newport Lodge.  Id. at 56. Although this admission suggests a lowering of inhibition consistent with alcohol impairment, this behavior is not necessarily indicative of intoxication, and there is no evidence that anyone else observed it.

[32] See Richardson Supplemental Report (doc. no. 51-10) at ¶ 9.

N.Y.2d 444, 451 (1997) ("Where the expert states his conclusion unencumbered by any trace of facts or data, [the] testimony should be given no probative force whatsoever.") (quoting Amatulli v. Delhi Constr. Corp., 77 N.Y.2d 525, 533-534 n.2 (1991)).  Even if the court considered Richardson's belated opinion that Lake's BAC at the time of last service was 0.123, that evidence and her opinion about what "obvious signs of intoxication" most people would have shown with that concentration, are inadequate on their own to prove that Burrows' service was negligent.

      **Excessive consumption.**  The plaintiffs next argue that Burrows knew or should have known that Lake was intoxicated based on the amount of alcohol Lake consumed and Lake's timeframe and pace of consumption.  Such "excessive consumption" evidence may support a negligent service claim.  See supra, Part III (A)(1); Homan v. Brandy Barrel Pub & Grill, Inc., 98 Mass. App. Ct. 1108 (2020) ("In some cases, the amount of alcohol consumed is so excessive that a jury could reasonably conclude that any person who consumed a similar amount of alcohol would appear drunk."); Fazioi v. Lincoln Rest. Grp., Inc., No. CIV.A. 01-4368, 2004 WL 2049234, at *5 (Mass. Super. Aug. 27, 2004) ("On this theory, at the time his last drink was served, Stewart would have had fourteen ounces. That quantity is substantial enough in itself to put Dakota's on notice of his likely intoxication, even absent behavioral manifestations. The evidence thus presents a genuine dispute of material fact for trial as to the plaintiff's claim against Dakota's.")  (citing Vickowksi, 422 Mass. at 611).

      While the evidence here is frustratingly unclear about precisely what occurred at the Newport Lodge and when, the court finds that there is enough evidence of Lake's excessive consumption of alcohol to preclude summary judgment for the Newport Lodge.  Construed in the light most favorable to the plaintiffs, the record reflects that Lake consumed a minimum of one

and a half alcoholic drinks at the Newport Lodge.  She consumed her first drink between

approximately 10:00 p.m. and 10:25 p.m.  It is undisputed that Burrows served the drinks in pint-

sized glasses (16 oz.) and filled each glass with ice before pouring any liquid into the glass.  She

also used the free pour method to mix the drinks, which involved pouring the alcohol while

counting in her head to a certain number, as opposed to measuring the alcohol with a shot glass

or other device.[33]

Burrows testified that she served Lake two drinks comprised of Tito's Vodka, water, and

a "splash" of crystal light. [34]  It is impossible to know exactly how much alcohol was in Lake's

drink because nobody measured the amount of alcohol before Lake consumed it.  The plaintiffs'

toxicologist opines that based on Lake's alcohol elimination rate, she would have had to

consume approximately 7.4 ounces of vodka at the Newport Lodge to reach a BAC of 0.12 at the

hospital and 0.16 at the time of the crash.  If she drank one and a half drinks, each drink would

have had to contain approximately five ounces of vodka.  The Newport Lodge does not offer any

scientific evidence to refute these calculations and does not otherwise challenge Richardson's

qualifications, calculation methods, or the results of those calculations, other than to call them

"highly improbable."[35]  Instead, it contends that Burrows' demonstration pour with Investigator

---

[33] Contrary to the plaintiffs' argument, which is unsupported by any case law or other authority, the fact that Burrows free poured the alcohol is not per se evidence of negligence.  Free pouring alcohol may be inadvisable, but it is not illegal, in and of itself, or even reckless.  See Homan, 98 Mass. App. Ct. 1108 (rejecting plaintiff's theory that bartender's service was reckless because the free pour method created the risk of over pouring).

[34] There is conflicting testimony about the name of the drinks Burrows served Lake at the lodge. Lake testified that she believed she was drinking a "Cape Cod" or "Cape Codder," containing vodka and cranberry juice, while Burrows described the drinks as "Tito's Vodka, water, and Crystal Light."  The parties do not consider this apparent conflict material or dispositive.

[35] As part of their motion to strike Richardson's supplemental report, defendants include evidence of a "demonstration" by a paralegal in their counsel's office purporting to show that five ounces of liquid would effectively fill a pint glass filled with ice.  This demonstration does

Williams' suggests that each drink contained up to three ounces of alcohol.  But Burrows admitted to Williams that her demonstration pour was smaller than her normal, routine pour, so it is not undisputed that Lake's first drink only contained three ounces of vodka.

Because the court must construe the evidence in the plaintiffs' favor, and defendants do not meaningfully challenge the plaintiffs' toxicology evidence, the court will assume for purposes of this motion that by the time Burrows served the second drink, Lake had consumed approximately five ounces of vodka over the course of approximately 20-25 minutes.  Lake's recollection that her first drink seemed stronger than normal also supports the inference that Burrows poured five ounces of alcohol into the drink.  While it is tempting to view this as a case about one "drink," a view a jury might very reasonably take, in fact, Lake's first drink may have contained the equivalent of three to five drinks' worth of alcohol.[36]  And the evidence, construed in the plaintiffs' favor, suggests that Lake drank that drink very quickly.  A rational jury could therefore infer that Lake had excessively consumed alcohol by the time Burrows served her a second drink.  There is also the possibility, based on Lake's statement to EMT Early, that she actually consumed a total of three drinks at the Lodge.

---

not disprove that Burrows may have poured five ounces of vodka into Lake's drinks.  If, other than vodka, the drinks included only a splash of water and crystal light, it is still possible, accounting for the size and volume of ice cubes involved, that Burrows could have poured five ounces of vodka into Lake's drink.

[36]  The court understands that a "normal" or "standard" mixed drink contains one to one-and-a-half ounces of alcohol.  See N.H. Liquor Comm'n, Div. of Enforcement & Licensing, House Policy Development:  A Guide to Developing Responsible Business Practices for On-Sale Licensees, at 11, available at https://www.nh.gov/liquor/enforcement/education/house-policies/index.htm (last accessed Feb. 24, 2022); National Institutes of Health, What is a Standard Drink?, available at https://www.niaaa.nih.gov/alcohols-effects-health/overview-alcohol-consumption/what-standard-drink (last accessed Feb. 24, 2022).

This excessive consumption evidence, *in addition to* Richardson's unchallenged BAC extrapolation opinion, is sufficient to create a genuine issue of material fact as to whether Burrows knew or should have known that Lake was intoxicated at the time of last service. Put differently, based on the summary judgment record, a rational jury could find that Lake's consumption of five ounces of vodka over a short time period "would be sufficient to put [Burrows] on notice that [she] was serving a [patron] who could potentially endanger others." Cimino v. Milford Keg, Inc., 385 Mass. 323, 328 (1982); see also Luc v. Madruga, No. 03-10862-GAO, 2005 WL 1877049, at *5 (D. Mass. Aug. 3, 2005), aff'd in part sub nom. Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85 (1st Cir. 2007) (unchallenged expert extrapolation opinion, combined with evidence that patron consumed several mixed drinks in a short time period, sufficed "to create a genuine issue of material fact as to whether [the patron] was exhibiting signs of intoxication at the time he was served his last drink at [the bar]."); Vickowski, 422 Mass at 612 n.5 (subsequent intoxication evidence – such as BAC – can "bolster" evidence of intoxication at the bar); Faust v. Albertson, 167 Wash. 2d 531, 543 (2009), as amended (Aug. 6, 2009) ("BAC evidence is relevant as corroborative and supportive of the credibility of firsthand observations").

**Additional potential evidence of Lake's intoxication**. The Newport Lodge characterizes this as a case involving a person who showed no visible signs of intoxication. While that may ultimately prove true, the summary judgment record is not as one sided as the Lodge portrays. For example, Burrows' testimony that she observed no signs of intoxication in Lake is clouded somewhat by the context of Burrows' own observations. While Burrows testified that she typically paid closer attention to lodge guests that she had never seen or met before, she also had limited interaction with Lake on the night of the crash. Aside from checking

Lake's identification, taking her first drink order, and watching her walk out of the lodge at the end of the night, Burrows did not interact with Lake. Cody ordered Lake's second drink, and Lake consumed her drinks in the porch area that was some distance away and mostly out of view from the bar where Burrows was working. Lake never returned to the bar where Burrows was located. Burrows was also serving other patrons while Lake sat on the porch, so her focus was not trained on Lake the entire time Lake was at the lodge. And all of this must be considered alongside the fact that Burrows was aware of the alcohol content of (at least) the first drink and how quickly Lake consumed it. Therefore, Burrows' testimony does not weigh as heavily in favor of the Lodge as presented in its summary judgment motion and the jury will determine the credibility of her observations.

In addition, there are other unresolved factual disputes which, if resolved in the plaintiffs' favor, may further support a jury finding of negligent service. For example, it is undisputed that Tina offered Lake a place to stay for the night, after spending approximately an hour with her at the Newport Lodge. The parties dispute the reason for Tina's offer. Tina testified that she was concerned that Lake had a long drive home back to Vermont and also possibly wanted to see Lake and Cody (who was also staying at Tina's house that night) become romantically involved. Lake testified that she thought Tina was concerned that Lake had consumed too much alcohol. Lake further testified that when she left the lodge, Cody told her to contact her when she got home to confirm that she arrived safely. Lake testified (without any hearsay or foundation/speculation objection to inclusion in the summary judgment record) that he was concerned that she had too much to drink.[37] The jury will weigh the credibility of these conflicting statements. Nevertheless, a rational fact finder could infer from Tina's offer and

_____

[37] Doc. 60-1 at 96.

Cody's concern that they observed Lake's consumption of alcohol, behavior, and physical presentation at the lodge and believed Lake had too much to drink.  Similarly, Lake admitted that she told a police officer that she was "buzzed" when she left the Newport Lodge and drank water before leaving the Lodge to try and offset the effect of the alcohol.  Such evidence could create reasonable inferences about what Burrows observed, knew, or should have known about Lake's condition.

Another seemingly important factual question that the record does not resolve is whether Lake and Cody drank alcohol somewhere else before going to the Newport Lodge.  Cody testified that after meeting up with Lake, the two went to an establishment called the Mountain View Tavern and may have eaten dinner there.[38]  He could not recall whether they drank alcohol at the Mountain View Tavern.  Cody did not initially tell state liquor commission investigators that he and Lake went to the Mountain View Tavern before going to the Newport Lodge.  Lake does not recall going to the Mountain View Tavern and denies drinking alcohol anywhere else on the night of the crash other than the Newport Lodge.  The record is therefore inconclusive at best about what Lake and Cody did between the time they met up and the time they arrived at the Newport Lodge.

The admitting nurse at Dartmouth-Hitchcock testified that Lake told her that she had consumed two rum and cokes and two cape cods while with a friend named Cody.[39]  Lake's medical record also states that she had consumed four mixed drinks at her friend's house earlier

---

[38] Cody Osgood Depo. (doc. no. 59-3) at 12.  Cody did not initially tell Investigator Williams that he and Lake went to the Mountain View Tavern before going to the Newport Lodge.

[39] See Affidavit of Emily Glaner (doc. no. 52-2).

that night.[40]  Lake also told the responding EMT that she had consumed three "cape cods" on the

night of the crash.[41]  It is undisputed that Lake did not consume alcohol after she left the

Newport Lodge and before the crash.  These additional facts therefore suggest that Lake

consumed alcohol somewhere else before going to the Newport Lodge, including possibly the

Mountain View Tavern or Cody's house.  If Lake consumed alcohol before going to the Lodge,

that would potentially contradict or undermine Burrows' and the others' testimony that they

observed no signs of intoxication in Lake when she arrived at the lodge or thereafter.

This set of circumstances revealed itself to be quite complicated at oral argument.

Plaintiffs' counsel candidly informed the court that their position at trial would be that Lake

consumed no alcohol before arriving at the Newport Lodge.  A reasonable jury could find that

she had in fact consumed alcohol beforehand, which could either support or undermine the

plaintiffs' case, depending on the jury's view of the evidence both substantively and as it relates

to the credibility of several witnesses.  This court routinely instructs juries that parties have no

"proprietary interests" in witness testimony or other evidence, and that they are free as the trier

of fact to weigh the evidence as they see fit based on the circumstances.  The same is true at

summary judgment, and the evidence of Lake's pre-lodge alcohol consumption must be

construed in the plaintiffs' favor even if the plaintiffs will argue against the evidence at trial.

Finally, the record is missing other pieces of information – again, in addition to the

number of drinks, the amount of alcohol in the drink(s), and the rate at which Lake consumed the

alcohol – that could bear on whether Burrows knew or reasonably should have known that Lake

was intoxicated.  These include:  (1) the amount of food Lake consumed on the day and evening

---

[40] See Doc. no. 52-3.

[41] See Early Depo. (doc. no. 46-11) at 28.

of the crash, including whether she consumed any food while drinking; (2) the amount of water and other non-alcoholic beverages she consumed, either before or while she drank alcohol at the Lodge, including non-alcoholic drinks served by Burrows; (3) whether Lake's statement that she drank "three Cape Codders" means that she was actually served three drinks at the Lodge; (4) whether Lake made any trips to the restroom at the Lodge (and how many of those trips the bartender observed); (5) the frequency of Lake's drinking at the time of the crash (i.e. whether she drank alcohol every day, once a week, or once a month); and (6) Lake's level of fatigue on the night of the crash. Whether such additional facts (if properly introduced at trial) help establish that Burrows knew or reasonably should have known that Lake was intoxicated will be up to the jury to decide. The Newport Lodge is not entitled to judgment as a matter of law on the plaintiffs' negligent service claim.

### 2.   Count 2 – Reckless service

The Newport Lodge also seeks summary judgment on the plaintiffs' reckless service claim. The reckless service statute provides that:

> I. A person who becomes intoxicated may bring an action against a defendant for serving alcoholic beverages only when the server of such beverages is reckless. The service of alcoholic beverages is reckless when a defendant intentionally serves alcoholic beverages to a person when the server knows, or a reasonable person in his position should have known, that such service creates an unreasonable risk of physical harm to the drinker or to others that is substantially greater than that which is necessary to make his conduct negligent.
>
> II. A defendant who recklessly provides alcoholic beverages to another is liable for resulting damages.
>
> III. Specific serving practices that are admissible as evidence of reckless conduct include, but are not limited to, the following:
>
> (a) Active encouragement of intoxicated persons to consume substantial amounts of alcoholic beverages.
> (b) Service of alcoholic beverages to a person, 16 years of age or under, when the server knows or should reasonably know the patron's age.

(c) Service of alcoholic beverages to a patron that is so continuous and excessive
that it creates a substantial risk of death by alcohol poisoning.
(d) The active assistance by a defendant of a patron into a motor vehicle when the
patron is so intoxicated that such assistance is required, and the defendant knows
or should know that the intoxicated person intends to operate the motor vehicle.

RSA 507-F:5 (emphasis added).

Assuming the reckless service statute creates a cause of action for those injured by
allegedly intoxicated, overserved persons – a point neither party challenges – the court agrees
with the Newport Lodge that no rational jury could find on these facts that the Lodge recklessly
served alcohol to Lake.  Importantly for the evaluation of this claim, none of the four statutory
examples of reckless service, nor anything resembling them, are present here.  There is no
evidence that Burrows encouraged Lake to consume alcohol at the Lodge.  Nor was her service
to Lake continuous and excessive, at least in terms of the amount of drinks served.  And
importantly, this statute requires proof that Burrows' service to Lake created "an unreasonable
risk of physical harm to the drinker or to others that is substantially greater than that which is
necessary to make his conduct negligent."  Id. (emphasis added).

No court has interpreted the reckless service statute in the context presented here.  In a
case involving liability of a "social host," however, the New Hampshire Supreme Court held
that, just as a "person who becomes intoxicated" may bring a reckless service claim against a
licensed liquor establishment under RSA 507-F:5, an intoxicated person may bring an action
against a social host, "so long as the plaintiff can allege that the service was reckless."
Hickingbotham v. Burke, 140 N.H. 28, 33 (1995).  The court noted that the "specific practices
outlined in RSA 507-F:5 as evidence of reckless conduct" for licensees "are also relevant" to
social host liability.  Id. at 36.  The court then found that a "social host's service of alcohol

would be reckless if the host 'consciously disregard[ed] a substantial and unjustifiable risk' of a high degree of danger." Id. at 33 (quoting Black's Law Dictionary 1270 (6th ed. 1990)).

Presuming the New Hampshire Supreme Court would apply this "conscious disregard" standard to a reckless service claim under RSA 507-F:5, there is no evidence that Burrows consciously disregarded a substantial risk in serving Lake alcohol.[42]  Nor is there evidence that the risk was "of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to [the actor], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" Id. at 33-34 (quoting Black's Law Dictionary 1270).  While free pouring drinks, rather than using a measured pour, carries some risk and is probably inadvisable for a number of reasons, it is neither illegal on its own nor a gross deviation from acceptable bartender conduct.  No rational jury could therefore find that Burrows knowingly disregarded a substantial risk, and therefore acted recklessly, when she served an additional drink (or two drinks) to a person who had just consumed one strong drink.  See Homan, 98 Mass. App. Ct. 1108 (no reckless service claim based only on use of free pouring method and alleged excessive consumption).  As the viability of plaintiffs' negligent service claim is a close call on summary judgment, and something

_____

[42] "Where the highest [state] court has not spoken directly on the question at issue, [the federal court] must predict, as best [it] can, that court's likely answer." Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011).  That prediction is based on the state supreme court's analogous decisions, any decisions of lower state courts (here none), and other reliable sources such as the decisions of other courts and commentary in treatises.  See Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011). Here, the most-analogous New Hampshire Supreme Court decision is Hickingbotham and there, among the other comparisons the court drew to RSA 507-F:5 in recognizing a reckless service claim against social hosts, the court noted that there are "many similarities" between liquor licensees and social hosts and "[n]othing inherent in the public policy of deterring drunk driving militates against holding social hosts to a standard similar to the one which licensees are held." 140 N.H. at 33.  This suggests that the New Hampshire Supreme Court would apply similar standards to reckless service claims against licensees as it would for social hosts.

substantially more than negligent conduct is required to establish recklessness, their claim cannot survive on this record.

### B.      Claims against Moose International

The plaintiffs assert two claims against Moose International.  First, they allege that Moose International is negligent under an assumed duty theory.  Second, they allege that it is vicariously liable for the Newport Lodge's negligence.  The court addresses each count in turn.

#### 1.      Count 3 - Negligence

The plaintiffs argue that by promulgating a set of general laws applicable to all local lodges and social quarters, Moose International assumed or created a duty to enforce those general laws and failed to do so here.  Specifically, Moose International breached its duty by not giving the Newport Lodge and its servers the information needed to enforce the rules and regulations relating to the service of alcoholic beverages and failing to implement a means to determine compliance with its own social quarters' rules and regulations.[43]  Moose International argues that based on the undisputed facts about its relationship with the Newport Lodge, no assumed or voluntarily created duty exists here.  The plaintiffs argue the opposite and seek partial summary judgment that a duty does in fact exist.

"A party who does not otherwise have a duty, but who voluntarily renders services for another, has been held to a duty of reasonable care in acting."  Coan v. N.H. Dep't of Env't Servs., 161 N.H. 1, 8 (2010).  "Breach of such a voluntarily assumed duty can create liability to third parties as well."  VanDeMark v. McDonald's Corp., 153 N.H. 753, 757 (2006) (citing Restatement (Second) of Torts § 324A (1965)).

---

[43] Complaint (doc. no. 16-1) at ¶ 46.

VanDeMark is instructive here.  In that case, an overnight custodian at a local McDonald's franchise was assaulted by two intruders while on the job.  The custodian sued McDonald's corporation under negligence (assumed duty) and vicarious liability theories.  The New Hampshire Supreme Court affirmed the trial court's grant of summary judgment to the national corporation, finding, as a matter of law, that McDonald's did not assume a duty to ensure that its franchisee would follow security measures recommended by McDonald's to protect employees.  The court found the following facts about the relationship between the national corporation and the local franchisee dispositive:  (1) the franchisee was separately incorporated from the national corporation; (2) the national corporation was not the parent corporation of the franchisee; (3) the franchisee, not the national corporation, owned the property where the tort occurred; (4) the national corporation issued standards and policy guidance for how franchisees should operate their restaurants; (5) the national corporation had the right to terminate the franchise agreement if the franchise failed to maintain and operate the restaurant in compliance with the national corp.'s standards; (6) the national corporation had a network of paid employees who would monitor franchisee restaurants ("field consultants"); (7) the field consultant for the franchise at issue conducted a review of the franchise, found deficiencies in the franchise's operations, and requested the franchise develop an action plan to rectify the deficiencies.

The relationship between Moose International and the Newport Lodge shares many of these characteristics.  Indeed, the level of interaction between McDonald's, through its field consultant, and the local franchise, far exceeded any recommendations that Saindon provided to the Newport Lodge about lodge operations generally or the social quarters.  Yet in VanDeMark, the court found that this level of influence and interaction did not create an assumed duty.

VanDeMark's import here is somewhat limited by the fact that the national corporation's policies on restaurant security were not mandatory for franchisees; they were intended as a guide. Here, the General Laws and rules and regulations relating to social quarters' operation are mandatory, and if a lodge violates them, Moose International has the right to terminate their charter or membership in the fraternal organization. Like VanDeMark, however, the General Laws expressly provide that the local lodges are solely responsible for enforcing the rules regarding the social quarters and operating the social quarters. The plaintiffs effectively ignore this fact in their summary judgment briefing.[44] They further ignore the fact that the Newport Lodge's House Committee actually operated its social quarters.

Moose International further argues that case law from other jurisdictions in the fraternity context supports a finding of no duty here. See, e.g., Grand Aerie Fraternal Order of Eagles v. Carneyhan, 169 S.W.3d 840, 847 (K.Y. 2005) (no assumed or created duty of national fraternal organization to supervise local chapter's alcohol sales, and no agency relationship creating vicarious liability); Shaheen v. Yonts, 394 Fed. Appx. 224, 229 (6th Cir. 2010) (no duty of national fraternity to oversee alcohol consumption at local fraternity houses); Garofalo v. Lambda Chi Alpha, 616 N.W.2d 647 (Iowa 2000). The plaintiffs respond that these cases are factually distinguishable from Moose International's relationship with the Newport Lodge. Each case is distinguishable in some way from this case, and none of them clearly support either side's arguments.

Nevertheless, the court adopts certain principles that emerge from these cases. First, the fact that Moose International enacted mandatory rules and regulations for local lodges is not

---

[44] At oral argument, plaintiffs' counsel focused his argument almost entirely on the text of the General Laws, yet he avoided any discussion of the portion of those laws that puts the responsibility for operating and overseeing the social quarters on the local lodges.

enough to create a duty under the facts and circumstances here.  Nor can the court, on these facts,

impose a duty on Moose International based on its right and power to discipline local lodges

(including revoking their charters) for failing to follow these rules.  The plaintiffs assert that

Moose International exercises far greater control than the national organizations in Grand Aerie,

Shaheen, and Garofalo and those cases are therefore inapposite.  They instead rely on Morrison

v. Kappa Alpha, 738 So. 2d 1105, 1118 (La. Ct. App. 1999), one of a small minority of cases

where the court found that a national fraternity assumed a duty of care over its local chapter.

The court is not persuaded that Morrison should control here.

      This case is distinguishable from Morrison in at least one significant way.  In Morrison,

there was evidence that the national fraternity was aware of prior incidents of hazing at local

fraternities, including the fraternity house at issue, and issued an anti-hazing policy in response

to those incidents.  The national fraternity also conducted educational programs and workshops

to address the pervasive problem of hazing.  Further, the local fraternity at issue had reported

several prior instances of hazing and the national organization took disciplinary action in

response to those reports.  This evidence  "fully support[ed] a conclusion that Kappa National

assumed a duty to regulate, protect against and prevent hazing by its collegiate chapters,

particularly an affiliate such as the Tech group which the national organization had specific

knowledge of engaging in hazing activity." 738 So. 2d at 1119.  The record here contains no

such evidence.

      As with issues of hazing in Morrison, or issues relating to security in VanDeMark, the

court must focus its assumed duty analysis on the aspect of the Newport Lodge's operations that

allegedly caused the decedents' deaths: the operation, including the sale of alcoholic beverages,

of the Lodge's social quarters.  See Grand Aerie, 169 S.W.3d at 848 (noting, as evidence of no

assumed duty, that the national organization's rules "specifically provide[s] for local control over the precise activity in question, i.e., the operation of a local chapter's social room.")  There is no evidence that service of alcohol to intoxicated persons at local lodges was a pervasive known issue, to Moose International as of September 2017, to which it responded by instituting rules and regulations relating to social quarters' operation.  There is likewise no evidence that Moose International had been monitoring and was aware of specific issues relating to alcohol service (such as using free pours) at the Newport Lodge at the time of the fatal collision.  In fact, the incident logbooks from the Newport Lodge from 2011 to prior to the incident in 2017 suggest that the lodge's bartenders did their jobs and either stopped serving alcohol to patrons they suspected were intoxicated, or assisted others with finding a ride home rather than allowing them to drive.[45]

Instead, the only record evidence of Moose International's involvement in the Newport Lodge's social quarters' operation is Territory Manager Saindon's involvement <u>after</u> the crash involving Lake.  There is no other evidence that Saindon, or any other representative of Moose International, raised any concerns about the Newport Lodge's social quarters, bartenders, or service of alcohol prior to the crash, and there is no evidence that it sanctioned the Newport Lodge for any violations of the rules and regulations for the social quarters.  Thus, both on paper (in the General Laws and rules and regulations) and in practice, the record evidence shows that Moose International and its representatives were not responsible for operating and enforcing the rules for lodge social quarters, nor did they operate the Lodge and enforce those rules.

Rather, the Newport Lodge's House Committee explicitly held the supervisory role over its social quarters.  While Moose International's written rules may show a higher level of general

---

[45] <u>See</u> Saindon Depo. (doc. no. 59-4).

control over local lodges than the national organizations or corporations in the case law, the

plaintiffs have not met their burden of introducing evidence that Moose International oversaw

and controlled the day-to-day operations of the Newport Lodge's social quarters.  See Barenborg

v. Sigma Alpha Epsilon Fraternity, 33 Cal. App. 5th 70, 84 (2019) ("The record is clear,

however, that any undertaking of services to Cal. Gamma did not include direct day-to-day

oversight and control of Cal. Gamma's activities or the conduct of its members. As reflected in

our discussion of respondent's relationship with Cal. Gamma, there is no evidence suggesting

that respondent had the right or ability to conduct such preventive monitoring of its over 200

local chapters. Assuming respondent undertook any specific duty through its rules, policies, and

guidelines, such a duty was educational, rather than one of direct supervision and control, as

appellant maintains.  Accordingly, the negligent undertaking doctrine is inapplicable.").  For

these reasons, the court finds that Moose International did not undertake some action that would

create a duty, or voluntarily assume a duty, specifically relating to the Newport Lodge's social

quarters' operation.  Absent a duty, the plaintiffs' negligence claim against Moose International

fails as a matter of law.

### 2.      Count 4 – Vicarious Liability

Lastly, the plaintiffs argue that the Newport Lodge is an agent of Moose International and

therefore Moose International, as principal, is vicariously liable for the negligent service of

alcohol by the Newport Lodge's bartender.  Moose International contends that it is entitled to

judgment as a matter of law on this claim because the requisite control is missing to establish an

agency relationship between it and the Newport Lodge.

"Whether an agency relationship has been established is a question of fact."  Dent v.

Exeter Hosp., Inc., 155 N.H. 787, 792 (2007) (citing VanDeMark, 153 N.H. at 760).  Three

elements are required to establish an agency relationship:  "(1) authorization from the principal

that the agent shall act for him or her; (2) the agents consent to so act; and (3) the understanding

that the principal is to exert some control over the agent's actions."  VanDeMark, 153 N.H. at

760.  "The granting of actual authority and consent to act with such authority may be either

express or implied from the parties' conduct or other evidence of intent."  Dent, 155 N.H. at 792

(citing Herman v. Monadnock PR–24 Training Council, 147 N.H. 754, 758–59 (2002)).

"Authority to act can be actual or apparent."  Boynton v. Figueroa, 154 N.H. 592, 604 (2006)

(citing State v. Zeta Chi Fraternity, 142 N.H. 16, 22 (1997)).  "Apparent authority . . . exists

where the principal so conducts itself as to cause a third party to reasonably believe that the

agent is authorized to act."  Id.

Moose International disputes that the plaintiffs can satisfy any of the elements of the

agency test, but only develops its argument on the control element.  Thus, for purposes of

deciding this motion, the court will focus on control.  "Control by the principal does not mean

actual or physical control at every moment; rather, it turns upon the principal manifesting some

continuous prescription of what the agent shall or shall not do."  Dent, 155 N.H. at 792 (citing

Herman, 147 N.H. at 758-59).  The control issue, however, "turns narrowly upon the defendant's

level of control over the alleged 'instrumentality' which caused the harm."  VanDeMark, 153

N.H. at 763 (citing Wendy Hong Wu v. Dunkin' Donuts, Inc., 105 F. Supp. 2d 83 (E.D.N.Y.

2000)); see also Cram v. Burger King Corp., No. 18-CV-394-LM, 2019 WL 4095570, at *5

(D.N.H. Aug. 29, 2019) ("Under these circumstances, even viewed in the light most favorable to

plaintiffs, there is no genuine dispute of material fact over whether Burger King controlled the

instrumentality that caused plaintiffs' harm." (citing VanDeMark, 153 N.H. at 763)).

The court in VanDeMark held that "the evidence demonstrates that although the defendant maintained authority to insure the uniformity and standardization of products and services offered by the Colley/McCoy restaurant, such authority did not extend to the control of security operations," which was the instrumentality that caused the harm.  Id. at 763.  In doing so, it declined to follow Butler v. McDonald's Corp., 110 F. Supp. 2d 62 (D.R.I. 2000), which found an agency relationship based on "indicia of general control," rather than specific control over the instrumentality of harm.  The plaintiffs here similarly rely on Moose International's alleged general control over its local lodges, as opposed to any specific control it exercised over the Newport Lodge's social quarters.

Here, the record contains no evidence of Moose International's actual control over the Newport Lodge's social quarters, the alleged instrumentality of the plaintiffs' harm.[46]  Moose International's rules provide that the local lodges exclusively control the operations of their social quarters.  In practice, at the time of the incident and to this day, the Newport Lodge's House Committee operated its social quarters and ensured compliance with Moose International's rules relating to social quarters' operation.  Importantly, any evidence of alleged control – Saindon's recommendation to Peck that the lodge stop using the free pour method – occurred after the incident in question, which is neither admissible nor dispositive.  See Bogenberger v. Pi Kappa Alpha Corp., Inc., 104 N.E.3d 1110, 1120 (Ill. 2018) ("The power to take remedial action 'after the fact' does not amount to the right to direct or control a local chapter or member's actions.").

---

[46] The plaintiffs cite the fact that the local lodges apportion some of their funds obtained through social quarters operations to Moose International as evidence of an agency relationship but cite no case law or other authority for this proposition.  The court disagrees that sending a percentage of funds to the national organization is evidence that the national organization controlled the local lodge.

Thus, there is no genuine issue of material fact as to whether Moose International exercised sufficient control over the Newport Lodge's social quarters' operation to find an agency relationship between Moose International and the Newport Lodge.  As Chief Judge McCafferty found in Cram, this conclusion is "not undermined by the fact that [MI] retained a general right to inspect the subject [lodge] and terminate the [lodge's charter] for noncompliance."  2019 WL 4095570, at n. 5; see also Wendy Hong Wu, 105 F. Supp. 2d at 88 (observing that "most courts" have concluded that retaining the right to enforce uniform standards, reserving a right to reenter and inspect the premises, or having a right to terminate an agreement for failure to meet standards does not exhibit sufficient control to subject franchisors to vicarious liability) aff'd sub nom. Wu v. Dunkin' Donuts, Inc., 4 F. App'x 82 (2d Cir. 2001); Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 617 (2013) ("Today we join these courts in concluding that a franchisor is vicariously liable for the conduct of its franchisee only where the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff."); Kerl v. Dennis Rasmussen, Inc., 682 N.W.2d 328, 341 (Wis. 2004) (describing same as "majority approach").  Moose International is accordingly entitled to judgment as a matter of law on the plaintiffs' vicarious liability claim.

IV.   <u>**Conclusion**</u>

For the reasons set forth above, the Newport Lodge's motion for summary judgment[47] is DENIED in part and GRANTED in part, Moose International's motion for summary judgment[48] is GRANTED, and the plaintiffs' partial motion for summary judgment[49] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:   March 9, 2022

cc:   Rebecca Anne Witmon, Esq.
       Gregory P. Howe, Esq.
       Matthew J. Lahey, Esq.
       Philip R. Waystack, Jr., Esq.
       David W. Johnston, Esq.
       Iryna N. Dore, Esq.
       Derek D. Lick, Esq.
       Katie A. Mosher, Esq.

---

[47] Doc. no. 46.

[48] Doc. no. 45.

[49] Doc. no. 48.